**E-FILED on** 8/17/06

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TXU ENERGY RETAIL COMPANY LP, fks TXU ENERGY TRADING COMPANY dba TXU ENERGY SERVICES<br><br>Plaintiff,<br><br>v.<br><br>AGRI-CEL, INC., ASSOCIATED ASPHALT PAVING MATERIALS, DELANO GROWERS GRAPE PRODUCTS, GRANITE CONSTRUCTION COMPANY, ILLINOIS TOOL WORKS, INC., J.G. BOSWELL COMPANY, LEPRINO FOODS COMPANY, INC., ADVANCED FOOD PRODUCTS as Successor by Merger to REAL FRESH, INC., STYROTEK, INC., CANANDAIGUA WINE COMPANY, INC., MITSUBISHI CEMENT CORPORATION, and APTCO LLC,<br><br>Defendants. | No. C-01-20289 RMW<br><br>ORDER DENYING LEPRINO FOODS COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT AND DENYING TXU'S MOTION FOR SUMMARY JUDGMENT<br><br>**[Re Docket Nos. 382, 424]** |

Defendant Leprino Foods Company, Inc. ("LFC") moves for summary judgment on plaintiff TXU Energy Retail Company's ("TXU")'s breach of contract and common count claims against

LFC.[1]  TXU opposes the motion.  In addition, TXU moves for summary judgment, or in the alternative partial summary judgment, on LFC's counterclaim for breach of contract as a third-party beneficiary.  LFC opposes the motion and, in opposition, requests the court to *sua sponte* enter partial summary judgment in its favor on the counterclaim.  The court heard oral argument on July 7, 2006.  The court has read the moving and responding papers and considered the argument of counsel.  For the reasons set forth below, the court DENIES LFC's motion for summary judgment and DENIES TXU's motion for summary judgment.  The court declines LFC's request to *sua sponte* enter partial summary judgment on LFC's counterclaim.

## I. BACKGROUND

### A. Factual allegations[2]

TXU is a seller of natural gas.  Western Retail Energy Co. ("Western Retail") is a natural gas broker employed by its customers to acquire natural gas for its customers' use as an alternative to purchases from conventional utility providers.  Pursuant to two Natural Gas Agency Agreements ("NGAA") between TXU and Western Retail covering the period from April 1999 to March 31, 2001, Western Retail acted as a broker for customers seeking natural gas supplies, and TXU acted as a seller to Western Retail's customers who executed a Natural Gas Sales Agreement ("NGSA") with TXU.  The NGAA provides:

> Western Retail represents that it has authority to act as Customers' Representative for all matters concerning the purchase by and delivery of gas to the Buyers.  Such authority includes, but is not limited to, establishing prices, pricing duration, volumes to be purchased, settlement of price disputes, settlement of imbalances and other such actions necessary to deliver gas to Buyer at the Point of Delivery.  Such authority also includes the specific right to establish Buyer's price using all available pricing methods including the use of financial options, forward pricing, swing swaps, and other such derivative products.  TXU Energy Services shall rely exclusively upon the representations of Western Retail for all matters relating to the sale of gas to Customers under the contract.

FASC, Ex. A at 2.

---

[1] The claims against LFC are count seven of the fifth cause of action (breach of contract) and count seven of the sixth cause of action (common counts) of TXU's Fourth Amended and Supplemental Complaint ("FASC").

[2] Further details regarding these disputes are discussed in this court's December 4, 2001 and December 15, 2004 orders.

The NGAA also provides that "Western Retail shall bear sole responsibility for and shall create independently all pricing structures used in connection with the Customers' accounts." *See, e.g.*, FASC Exs. A, B. In addition, the NGAA contemplates that "TXU Energy Services will execute Gas Sales Agreements with each individual Customer for a term corresponding to the term of this Agreement." *Id.* TXU alleges that it entered into a Natural Gas Sales Agreement ("NGSA") with each of the California customers, including LFC.[3] The NGSA states in relevant part:

> Western Retail shall have agency authority as and shall in fact be Buyer's Representative for all matters concerning the purchase by and delivery of gas to Buyer. Such authority includes, but is not limited to, establishing prices, pricing duration, volumes to be purchased, settlement of price disputes, settlement of imbalances and other such actions necessary to deliver gas to Buyer at the Point of Delivery. Such authority also includes the specific right to establish Buyer's price using all available pricing methods including the use of financial options, forward pricing, swing swaps, and other such derivative products. Seller shall rely exclusively upon the representations of Buyer's Representative for all matters under the contract.

*See, e.g.,* FASC, Ex. O. The NGSA also provides:

> No party receiving proceeds under this Agreement may request any adjustment or correction of any statement or payment unless written notice of such request for adjustment or correction is furnished within twelve (12) months of the date of the statement or payment for which such adjustment or correction is requested.

*Id.* Pursuant to two "Acknowledgments" executed between Western Retail and LFC, Western Retail served as LFC's "natural gas supply agent" for negotiating supply contracts and terms during the relevant periods and to establish "pricing, price duration, volumes to be purchased and settlements of imbalances and price disputes." Western Retail was permitted to engage in financial hedging of gas prices on LFC's behalf:

> Such authority also includes the specific right to establish [LFC's] price using all available pricing methods including the use of financial options, forward pricing, swing swaps and other such derivative products. Western agrees to confirm all financial futures transactions greater than ninety (90) days in duration with Leprino.

W. Samuel Niece Decl. Supp. TXU's Opp. ("Niece Decl."), Ex. I at 4-5.

Western Retail served as LFC's broker for natural gas from 1991 until September 2002 for

---

[3] It remains unclear whether LFC executed an NGSA with TXU. TXU's NGSA #9895 is purportedly the NGSA between TXU and LFC, but is signed only by TXU. LFC asserts that it never received or executed an NGSA. *See* FASC Ex. O.

ORDER DENYING LEPRINO FOODS COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT AND DENYING TXU'S MOTION FOR SUMMARY JUDGMENT
No. C-01-20289 RMW
SPT                                                            3

the supply of natural gas to LFC's Tracy and Lemoore facilities. Shirley E. Jackson Decl. Supp. Mot. Summ. J. ("Jackson Decl."), Ex. A at 19:9-18. Among other business, LFC manufactures cheese and related products at its two California facilities, located in Tracy and Lemoore. *Id.* at 53:14-54:8. Pursuant to the NGAA between TXU and Western Retail, Western Retail placed orders for the purchase of natural gas for its California customers, including LFC, on TXU's credit in the wholesale market. Jackson Decl., Ex. D at 10:19-11:13; Ex. F at 22:5-7.[4] The gas is delivered to the appropriate local utility company, either Pacific Gas and Electric ("PG&E") or Southern California Gas ("SoCal"), for further delivery to the individual customer locations. Each month, TXU bills the customers directly for actual gas usage based on the final meter readings provided by the utility company multiplied by that month's weighted average cost of gas ("WACOG"). *Id.* at 9:12-20; Jackson Decl., Ex. F at 22:5-14. The monthly WACOG is provided by Western Retail to TXU at the end of each month for the purpose of billing Western Retail's customers. *Id.* It is undisputed that TXU billed LFC on a monthly basis and that LFC paid each of the monthly invoices.

Western Retail appears to have engaged in at least two types of financial transactions affecting the WACOG related to its natural gas purchases on behalf of the California customers, including LFC. Imbalances are created whenever Western Retail's customers consumed more or less gas than Western Retail purchased for that month. For a short imbalance position (where Western Retail purchased less gas than its consumers actually used) PG&E or SoCal effectively makes a short-term loan of the gas, which Western Retail must resolve in the next month. Conversely, for a long imbalance position (where Western Retail purchased more gas than its consumers actually used), Western Retail must sell the excess gas on the open market in the next month.[5] Niece Decl., Ex. N at 57:2-61:14; Ex. R at 33:1-18. Therefore, in any particular month, the WACOG may also reflect the "purchase of imbalance gas" or a "sale of imbalance gas" at the applicable price of

---

[4] Because the orders were placed on TXU's credit, the third party vendors of the natural gas invoiced TXU for the purchases.

[5] In addition, PG&E has a "tolerance band" such that an imbalance of up to 5% of the month's usage may be carried forward into the next two months. Similarly, SoCal's tolerance band permits carry forward of up to 10% of usage into the next month. Niece Decl., Ex. N at 59:9-60:7.

purchase or sale. Niece Decl., Ex. N at 61:2-15. A park and loan transaction is one where Western Retail chooses to borrow gas from TXU's volume supply with either PG&E or SoCal in one month to be repaid back in three or four months at the then prevailing market price. At times Western Retail included an estimate of its expected purchase price of the gas to be repaid in the later month into the WACOG calculation for the month it borrowed the gas. Niece Decl., Ex. O at 47:14-48:8; Ex. P at 15:3-16:7.[6] However, the actual purchase price would not be known until Western Retail repaid the borrowed gas. *Id.*

In October 2000 Western Retail engaged in a park and loan transaction in which it borrowed approximately 310,000 MMBtu's[7] from PG&E and SoCal to be repaid in January of 2001. Niece Decl., Ex. U at 17:16-18:13. At the time the prevailing market price was $5 per MMBtu. In January 2001, when the park and loan transaction was to be repaid, the prevailing market price was $16 per MMBtu. Niece Decl., Ex. H. TXU alleges that the WACOG reported by Western Retail was never adjusted for the additional cost of $16 per unit over the $5 per unit estimated for the October 2000 WACOG. Niece Decl., Ex. L at 54:22-55:9. This misstatement in WACOG was allegedly not discovered until June 2001. *Id.* In August 2001 TXU informed LFC that it had under billed LFC $261,383.48, and in December 2001 TXU adjusted the amount it had under billed LFC to $979,805.12. TXU filed suit seeking, *inter alia*, payment by LFC of the under billed amounts.

**B.     Procedural History**

The initial dispute between these parties arose in December 2000. According to Western Retail, TXU unilaterally changed the manner in which Western Retail was able to purchase gas from TXU by refusing to permit Western Retail to purchase gas on a "financial basis" and instead requiring Western Retail to purchase gas on a "physical basis," a less financially attractive alternative. TXU denies that it had any obligation to sell gas on a "financial basis" rather than a

---

[6] According to the deposition testimony of Tina Kavanaugh and Cathy Hawes, it appears that Western Retail did not include the estimated future price on a consistent basis. *See* Niece Decl., Ex. O at 47:14-48:8; Ex. P at 15:3-16:7. Kavanaugh and Hawes apparently both work for TXU.

[7] One MMBtu is one million Btu or one decatherm.

"physical basis." A complaint for declaratory judgment was filed in this court by TXU against Western Retail, and Willis C. Bennett as alter ego of Western Retail, on April 9, 2001. TXU sought declaratory relief that it had no obligation, pursuant to an April 2000 NGAA, to sell to Western Retail or its customers any financial derivative products relating to the sale of natural gas.

Western Retail filed a complaint in Colorado state court on July 9, 2001 ("Colorado action") after the contract between Western Retail and TXU was terminated, alleging claims for breach of contract, breach of the duty of good faith and fair dealing, promissory estoppel, negligent misrepresentation, and declaratory judgment and seeking an accounting.

TXU filed the currently operative Fourth Amended and Supplemental Complaint on June 20, 2003. The Colorado action settled immediately prior to the October 14, 2003 trial date, and was dismissed on March 15, 2004. On May 10, 2004 this court lifted the stay in this action. Subsequent to the stay, in July 2004 LFC filed counterclaims against TXU. LFC alleges that under the terms of the NGAA and NGSA (to the extent one is found to exist between LFC and TXU), it had the right under Western Retail's sole discretion to purchase natural gas on a financial basis, and TXU's refusal to allow sales on a financial basis constituted a breach of contract. The court dismissed LFC's counterclaims alleging breach of an NGSA on the basis that LFC could not state a breach of contract claim against TXU because it had not adequately alleged that it complied with the terms of the NGSA.[8] Dec. 15, 2004 Order at 18. However, the court denied TXU's motion to dismiss LFC's counterclaim for breach of contract as third-party beneficiary under the NGAA. *Id.* at 18-19.[9]

Before this court is LFC's motion seeking summary judgment on TXU's breach of contract and common counts claims under the "accounts stated doctrine" and TXU's motion for summary judgment, or in the alternative partial summary judgment, on LFC's counterclaim for breach of contract as a third-party beneficiary under the NGAA.

---

[8] LFC contends that it never received or executed an NGSA with TXU.

[9] The court's Dec. 15, 2004 Order also granted thirty days leave to amend the counterclaims, but LFC did not file amended counterclaims.

## II. ANALYSIS

### A. Legal Standard

Summary judgment is granted where there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In a motion for summary judgment the court draws all reasonable inferences that may be taken from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In *Nissan Fire* the Ninth Circuit elaborated:

> In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact.

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000) (citations omitted). Under FED.R.CIV.P. 56(d) the court may "make an order specifying the facts that appear without substantial controversy, including to which . . . relief is not in controversy."

### B. LFC's Motion for Summary Judgment

LFC contends that the account stated doctrine applies here because (1) TXU billed LFC on a monthly basis for LFC's consumption of natural gas, creating an open account relationship, (2) LFC paid each of the monthly invoices based on the amounts stated therein, and (3) TXU did not object to the balances billed and paid each month. The parties do not dispute that an open book relationship existed and that LFC paid the monthly billed amounts. At issue is whether TXU's lack of objection to the monthly amounts billed and paid creates an account stated as to each month's billing.

#### 1. Waiver of account stated defense

LFC asserts that TXU's claims for breach of contract and for common counts are barred as a matter of law by the account stated doctrine. As an initial matter, TXU asserts that LFC has waived the account stated defense because it has not been pleaded as an affirmative defense. In *San Jose Brick Company v. Rhodes-Jamieson Company*, 112 Cal. App. 558, 561 (1931), the court held that "the defense of a stated account is not a special defense which must be pleaded in those terms."

Rather, because "the statement of account upon which the defendant relied was evidence of payment of the account in full," and the defendant had properly pleaded payment in full, the defense was not waived. *Id.* Here, TXU sued for indebtedness owed by LFC on an open book account. *See* FASC ¶ 197. It is not disputed that LFC's seventh affirmative defense pleads that it has "paid in full for the natural gas allegedly delivered and used as alleged in the FAC." LFC's Request for Judicial Notice, Ex. A ¶ 111. Accordingly, the court finds that LFC has not waived an argument that TXU is barred by the account stated doctrine.

### 2. Account stated

"An account stated is an agreement, based on the prior transactions between the parties, that the items of the account are true and that the balance struck is due and owing from one party to another." *Gleason v. Klamer*, 103 Cal. App. 3d 782, 786 (1980) (citations omitted). "[W]here a creditor renders a statement and the debtor fails to object within a reasonable time, the open account may be superseded by an account stated." *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d 1538, 1543 (9th Cir. 1988) (citation omitted). Under California law, an account stated may be implied from the circumstances:

> The agreement of the parties necessary to establish an account stated need not be express and frequently is implied from the circumstances. In the usual situation, it comes about by the creditor rendering a statement of the account to the debtor. If the debtor fails to object to the statement within a reasonable time, the law implies his agreement that the account is correct as rendered.

*Zinn v. Fred R. Bright Co.*, 271 Cal. App. 2d 597, 600 (1969) (citations omitted). However, "an account stated does not bar a recovery for items not within the contemplation of the parties when the settlement was made." *Vaughan v. County of Tulare*, 56 Cal. App. 261, 268 (1922).

TXU contends that the account stated doctrine does not apply because the arrangement among TXU, LFC, and Western Retail (as LFC's agent) necessarily contemplates future adjustments of the billed amount, notwithstanding the monthly invoicing. TXU alleges that both LFC and TXU gave Western Retail sole responsibility for determining the WACOG. The Acknowledgments between LFC and Western Retail specifically contemplate Western Retail's engaging in futures

transactions in establishing LFC's price, including transactions that may not settle for ninety days later (or possibly longer). The Acknowledgment provides:

> Such authority also includes the specific right to establish [LFC's] price using all available pricing methods including the use of financial options, forward pricing, swing swaps and other such derivative products. Western agrees to confirm all financial futures transactions greater than ninety (90) days in duration with Leprino.

Niece Decl., Ex. I at 4-5.[10] The monthly invoices often include resolutions of imbalances from prior months. Therefore, TXU argues, the impact of futures transactions and of imbalances on a particular month's WACOG is not within the contemplation of the parties at the time that month's invoice is issued and paid.

The court finds TXU's argument persuasive. Although the parties dispute what constitutes the operative contracts between TXU and LFC, the allegations support an inference that LFC's pricing was subject to the effect of futures transactions entered into by Western Retail. As alleged, monthly billings are subject to later adjustments for "imbalances" and transactions such as "park and loan" transactions for at least some time after the month's invoice has been issued. *See Vaughan*, 56 Cal. App. at 268 ("a stated account is held to be, as a rule, *prima facie* evidence only of the accuracy and correctness of the charges stated therein"). Moreover, "[a]n account stated need not cover all the dealings or claims between the parties. There may be a partial settlement and account stated as to some of the transactions." *Gleason*, 103 Cal. App. 3d at 790. In *Gleason*, the court found that the alleged course of conduct between the parties raised at least a triable issue of fact as to whether the account stated is limited to only some of the charges rather than the entire relationship between the parties. *Id.* Here, similar issues of fact are raised by TXU's allegations. It is not disputed that while TXU received monthly usage information from PG&E and SoCal, the price component of the monthly bills is established by Western Retail and subject to adjustment based upon any financial transactions by Western Retail. Whether TXU acted reasonably in reviewing and reconciling the billings is necessarily subject to Western Retail's diligence in providing pricing information. *See id.* (noting that an account stated does not bar recovery of items

---

[10] The arrangement also contemplates imbalances that need to be resolved in future, but the parties do not seem to dispute that imbalances are generally resolved within one month.

omitted by mistake). Therefore, even assuming that some of the billings might constitute stated accounts, TXU's allegations of the billing arrangement among TXU, LFC, and Western Retail raise material issues of fact as to whether at least some of the invoices are reasonably subject to later adjustment of the WACOG and whether TXU's August and December 2001 notifications of under billing was made within a reasonable time.

### C. TXU's Motion for Summary Judgment on LFC's Counterclaim

LFC alleges that to the extent the NGAA is found to be binding on LFC as a third-party beneficiary, LFC counterclaims that TXU is in breach of the NGAA by not permitting Western to purchase gas on a financial basis.[11] Specifically, LFC counterclaims that TXU induced Western Retail to represent to LFC that TXU would allow LFC to "obtain natural gas at a favorable price using financial options, forward pricing, swing swaps, and other such derivative products[,]" LFC Countercl. ¶ 28, but then refused to permit purchases on those bases. *Id.* ¶¶ 31-32. LFC also alleges compliance under the NGAA and damages resulting from TXU's breach. *Id.* ¶ 34.

TXU moves for summary judgment or, in the alternative, partial summary judgment, on the basis that LFC is not a third-party beneficiary of the NGAA between TXU and Western Retail. "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." CAL. CIV. CODE § 1559. A third party need not be named in the contract to be a third-party beneficiary, but the intent of the contracting parties must have been to benefit such third party:

> Traditional third party beneficiary principles do not require that the person to be benefited [sic] be named in the contract. A third party may qualify as a beneficiary under a contract where the contracting parties must have intended to benefit that individual and such intent appears on the terms of the agreement. It is well settled, however, that Civil Code section 1559 excludes enforcement of a contract by persons who are only incidentally or remotely benefited [sic] by the agreement.

*Harper v. Wausau Ins. Co.*, 56 Cal. App. 4th 1079, 1087 (1997). "Whether a third party is an

---

[11] TXU notes that the alleged events giving rise to LFC's counterclaim (relating to TXU's refusal to permit gas purchases on a financial basis) occurred in October 2000 through January 2001. *See* TXU's Mot. Summ. J. at 10. Therefore, at issue is the NGAA covering the period from April 2000 through March 2001. It remains unclear from LFC's counterclaim whether the alleged breach of the NGAA is limited to the NGAA for April 2000 through March 2001.

ORDER DENYING LEPRINO FOODS COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT AND DENYING TXU'S MOTION FOR SUMMARY JUDGMENT
No. C-01-20289 RMW
SPT                                                              10

intended beneficiary or merely an incidental beneficiary to the contract involves the construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered." *Johnson v. Super. Court*, 80 Cal. App. 4th 1050, 1064 (2000).

TXU first argues that neither TXU nor Western Retail intended to make LFC a third-party beneficiary of the NGAA for the purposes of financial trades. In opposition, LFC argues that the plain language of the NGAA clearly provides that the California customers are the intended beneficiaries of the NGAA and because Western Retail entered into the NGAA as the California customers' agent, LFC is necessarily a beneficiary of the NGAA.[12] As LFC argues, the recitals in the NGAA suggest that the California customers are intended beneficiaries of the contemplated relationship between TXU and Western Retail:

> WHEREAS, Western Retail is a broker employed by parties seeking natural gas supplies ("Customers") to: (i) Secure natural gas for Customers, (ii) negotiate price on behalf of Customers, and (iii) ask as a buyer's representative for Customers; and
>
> WHEREAS, TXU Energy Services is willing to sell natural gas to Customers and manage those quantities of natural gas; and
>
> WHEREAS, Western Retail and TXU Energy Services wish to enter into an Agreement whereby TXU Energy Services agrees to sell and manage gas supplies to Customers,

FASC, Ex. A at 2. Therefore, there is at least an inference that the purpose of the NGAA is to enable TXU to sell gas to the individual customers pursuant to NGSAs with the individual customers.

TXU asserts that because it is alleged that both the NGAA and the NGSA were executed simultaneously, LFC's rights against TXU are limited to those set forth in the NGSA. In other words, the NGAA sets forth Western Retail's rights against TXU while the NGSA sets forth LFC's

---

[12] LFC appears to argue that it is a third party because Western Retail served as its agent in entering into the NGAA. It seems that under an agency theory LFC would be a party to the contract rather than a third-party beneficiary. An agent is "anyone who undertakes to transact some business, or manage some affair, for another, by authority of and on account of the latter." *Woolley v. Embassy Suites, Inc.*, 227 Cal. App. 3d 1520, 1531 (1991). The agent "acts for and in place of the principal for the purpose of bringing him or her into legal relations with third parties." *Id.* LFC's counterclaim seeks damages as a third-party beneficiary of the NGAA. Nevertheless, the contention that Western Retail is LFC's agent supports an inference that Western Retail intended some benefit to LFC in executing the NGAA.

rights against TXU. TXU relies upon *Pankow Constr. Co. v. Advance Mortgage Corp.*, 618 F.2d 611, 616 (1980), for the proposition that LFC is not a third-party beneficiary "for purposes of financial trades" because the NGSA, a direct contract between TXU and LFC, contains the same contractual provision regarding financial trades. The *Pankow* court stated "[b]y definition a third party beneficiary does not rely upon a right 'created by direct written contract.'" *Id.* As an initial matter, the *Pankow* court was referring to CAL. CIV. CODE § 3264 which applies to funds for payment of construction costs for works of improvement. In any event, *Pankow* would not bar LFC from arguing that in addition to any rights under a purported NGSA, it is also a third-party beneficiary of the NGAA. Both the NGAA and the NGSA provide that Western Retail shall:

> [E]stablish[] prices, pricing duration, volumes to be purchased, settlement of price disputes, settlement of imbalances and other such actions necessary to deliver gas to Buyer at the Point of Delivery. Such authority also includes the specific right to establish Buyer's price using all available pricing methods including the use of financial options, forward pricing, swing swaps, and other such derivative products.

Both agreements also provide that TXU shall rely exclusively upon Western Retail's representations for all matters related to the sale of gas to the customers. *Id.* Both provision essentially vest Western Retail with the authority to determine the prices that the California customers are to pay for the natural gas supplied by TXU, including to provide "a hedging mechanism for [Western Retail's] customers." Jackson Decl., Ex. E at 18:3-16. The NGAA provides that TXU grants Western Retail the exclusive right to establish prices, including through use of financial transactions. Therefore, under the NGAA, there is an issue of material fact whether LFC is an intended beneficiary of Western Retail's ability to hedge gas prices. Under the alleged NGSA, LFC agrees that Western Retail shall determine the prices it will pay to TXU. However, nothing in the NGSA provision indicates that any hedging by Western Retail would not be for LFC's benefit, particularly in light of Western Retail's role as LFC's agent in entering into the NGAA. Thus, it does not necessarily follow from the existence of the provision in both the NGAA and the NGSA that LFC cannot be a third-party beneficiary of the NGAA. Drawing all inferences in the light most favorable to LFC, the parties' decision to include the provision in both agreements does not negate that LFC might be a third-party beneficiary of the NGAA.

**D.     LFC's Request for *Sua Sponte* Entry of Partial Summary Judgment**

The court declines, as LFC requests, to *sua sponte* enter partial summary judgment that LFC is an intended third-beneficiary of the NGAA. The evidence is not uncontradicted that LFC is an intended third party beneficiary. For example, the agreements, whether express or implied, which govern the relationship between LFC and TXU remain unclear as LFC contends it never executed an NGSA. As noted above, viewing the evidence in the light most favorable to LFC, there is at least an inference that the existence of the same provision in an NGSA (which TXU alleges exists between TXU and LFC) does not preclude LFC from arguing that it is a third-party beneficiary of the NGAA. The court also does not find that TXU is judicially estopped. Although TXU argued in the Colorado action that Western Retail lacked standing to sue for damages attributed to the California customers due to TXU's alleged breach of the NGAA, it does not necessarily follow that TXU argued that Western Retail could not sue for any damages under the NGAA or that only the California customers could sue under the NGAA.

### III. ORDER

For the foregoing reasons, the court DENIES LFC's motion for summary judgment and DENIES TXU's motion for summary judgment on LFC's counterclaim. The court declines LFC's request to *sua sponte* enter partial summary judgment on LFC's counterclaim.

DATED:     8/16/06

*Ronald M Whyte*
RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff(s):**

| | |
|---|---|
| William Stephen Boyd | sboyd@hunton.com |
| Kenneth L. Nissly | kennissly@thelenreid.com |
| William Samuel Niece | wsniece@thelenreid.com |
| Susan G. van Keulen | svankeulen@thelenreid.com |

**Counsel for Defendant(s):**

| | |
|---|---|
| David T. Biderman | dbiderman@perkinscoie.com |
| Raymond Carlson | levinson@griswoldlasalle.com |
| William T. Eliopoulos | weliopoulos@rutan.com |
| J. Randall Faith | jrfaith@aol.com |
| Donald P. Gagliardi | dgagliardi@be-law.com |
| Angus M. MacLeod | amacleod@bkscal.com |
| Patrick Theodore Markham | ptmarkham@jacobsonmarkham.com |
| Daniel W. Rowley | dwr@bnrlaw.com |
| Paul M. Zieff | pzieff@rjop.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:** 8/17/06      **SPT**
                       **Chambers of Judge Whyte**